[Cite as *State ex rel. DiPietrantonio v. Indus. Comm.*, 2017-Ohio-720.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Benedetto DiPietrantonio, | : | |
| | : | |
| Relator, | : | No. 16AP-391 |
| v. | : | (REGULAR CALENDAR) |
| Industrial Commission of Ohio and Hammond Construction, Inc., | : | |
| | : | |
| Respondents. | : | |
| | : | |

D E C I S I O N

Rendered on February 28, 2017

**On brief:** *Schiavoni, Schiavoni, Bush & Muldowney, Shawn R. Muldowney,* and *Joseph J. Bush, III*, for relator.

**On brief:** *Michael DeWine,* Attorney General, and *LaTawnda N. Moore,* for respondent Industrial Commission of Ohio.

**On brief:** *Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A., Edward D. Murray,* and *James M. Williams,* for respondent Hammond Construction, Inc.

IN MANDAMUS

DORRIAN, J.

{¶ 1} In this original action, relator, Benedetto DiPietrantonio, requests this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying his request for temporary total disability

("TTD") compensation based on a finding that he voluntarily abandoned his employment, and ordering the commission to find that he is entitled to TTD compensation.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto. The magistrate recommends that this court deny relator's request for a writ of mandamus.

{¶ 3} No party has filed objections to the magistrate's decision. The case is now before this court for review.

{¶ 4} We find no error of law or other defect evident on the face of the magistrate's decision. Therefore, we adopt the findings of fact and conclusions of law contained therein. Accordingly, relator's request for a writ of mandamus is denied.

*Writ of mandamus denied.*

SADLER and LUPER SCHUSTER, JJ., concur.

_____

**APPENDIX**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Bennedetto DiPietrantonio, | : | |
| Relator, | : | |
| v. | : | No. 16AP-391 |
| Industrial Commission of Ohio and | : | (REGULAR CALENDAR) |
| Hammond Construction, Inc., | : | |
| Respondents. | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on October 25, 2016

*Schiavoni, Schiavoni, Bush & Muldowney, Shawn R. Muldowney,* and *Joseph J. Bush, III,* for relator.

*Michael DeWine,* Attorney General, and *LaTawnda N. Moore,* for respondent Industrial Commission of Ohio.

*Krugliak, Wilkins, Griffiths, & Dougherty Co., L.P.A., Edward D. Murray,* and *James M. Williams,* for respondent Hammond Construction, Inc.

IN MANDAMUS

{¶ 5} Relator, Bennedetto DiPietrantonio, has filed this original action requesting this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying his request for temporary total disability ("TTD") compensation based on a finding that he had voluntarily abandoned his

employment, and ordering the commission to find that he is entitled to that compensation.

Findings of Fact:

{¶ 6} 1. Relator sustained a work-related injury on October 24, 2013 and his workers' compensation claim has been allowed for the following conditions:

> Contusion right lower leg; abrasion right hip and leg; contusion right ankle; contusion right forearm; sprain right ankle; sprain right foot; high grade aft tear; calcaneus fracture; articular cartilage disorder right ankle; major depressive disorder single episode, mild.

{¶ 7} 2. Although relator was unable to return to his former position of employment, his physician of record released him to return to work with restrictions.

{¶ 8} 3. Relator's employer, Hammond Construction, Inc. ("Hammond"), did not have any positions available within relator's restrictions; however, relator was qualified to participate in a Modified Duty Off-Site ("MDOS") program.

{¶ 9} 4. In a letter dated January 30, 2015, Hammond explained the purpose of relator's temporary placement, and informed him that the rules set forth in his employee handbook would apply while he was temporarily assigned to work at the American Red Cross facility. Specifically, that letter provides:

> As you are aware, your physician of record has released you to return to work with restrictions. A copy of the restricted work release has been attached for your review.
>
> At this time, no position is available within your physician outlined temporary restrictions at your current employer. Per Company policy, it has been determined that you qualify to participate in the Modified Duty Off-Site Program. Through VocWorks, Hammond Construction Inc. has agreements with several non-profit organizations to provide temporary placement for you within your outlined restrictions.
>
> An alternative position has been secured at a local non-profit facility that is within your physician outlined restrictions. This is a temporary placement and the purpose of this temporary placement is to facilitate a timely and safe return to work with the ultimate goal of returning to work on-site at Hammond Construction Inc.

You are scheduled to report to work at the American Red Cross * * * Tuesday, February 3, 2015, at 9:00 a.m. Your work schedule will be Monday through Friday between the hours of 9:00 a.m. to 12:00 p.m. You will be reporting to Mark Morrow, and his phone number is * * *. Your VocWorks Case Manager, Linda Gillespie, will be meeting you at the off-site location on this day and her telephone number is * * *.

You are also scheduled to report to work at the Jefferson County Humane Society, * * * on Tuesday, February 3, 2015, at 10:00 a.m. Your work schedule will be Monday through Friday between the hours of 1:00 p.m. to 5:00 p.m. You will be reporting to Cindy Bailey, and her phone number is * * *. Your VocWorks Case Manager, Linda Gillespie, will be meeting you at the off-site location on this day and her telephone number is * * *.

While participating in the MDOS program, you will be required to follow all Company HR policy regarding attendance, reporting off, language, behavior, cell phone use, etc. (Please refer to Company Employee Handbook). An employee who fails to show up for a scheduled work day at the non-profit and has not followed the procedure for calling off will be considered to have quit without notice unless an acceptable reason has been given and is accepted by Company Management.

Please note that refusal of the MDOS placement may result in termination of all Workers' Compensation benefits.

Your employer is fully committed to bringing every injured employee back to work. If you select not to return to work on the date and time stated above, you will be considered to have voluntarily quit your employment with Hammond Construction, Inc.

{¶ 10} 5. On February 3, 2015, relator and Hammond entered into an MDOS program agreement, which provides:

"I, Bennedetto Di[P]ietrantonio," understand that I remain an employee of Hammond Construction while working for the off-site facility:

American Red Cross * * *

I will be working 15-20 hours per week, between the hours of 9:00 a.m. to 12:00 p.m. (Monday through Friday). This position will be "temporary" and will not result in a permanent position with the placement organization.

While participating in the Modified Duty Off-site program, I will continue to be covered under my employer[']s Workers' Compensation program and HR policies.

I will be expected to document and have the agency supervisor sign the weekly time records. The signed weekly attendance record needs to be received at [sic] my employer by 8:00am-9:00am on Wednesday morning of each week.

{¶ 11} 6. The employee handbook which relator received, provides the following relevant policies:

### 3.3 Recording Your Time

Employees must record their hours on a Company approved time sheet and submit it to the Payroll/Accounting Department. Pay periods run from Wednesday through the following Tuesday. Employees are required to accurately record all time worked and submit the information to the Payroll/Accounting Department no later than Wednesday morning.

* * *

### 3.10 Corrective Action

Hammond Construction holds each of its employees to certain work rules and standards of conduct. When an employee deviates from these rules and standards, corrective action will be taken.

Disciplinary action may include but is not limited to a verbal warning, written warning, suspension without pay and/or discharge. The appropriate disciplinary action will be imposed at the discretion of Hammond. We do not guarantee that one form of disciplinary action will necessarily precede another.

In accordance with the employment-at-will relationship between the Company and the employees, dismissal or termination is within the solo discretion of the Company and

may be at any time for any or no reason, with or without notice.

The Company considers certain rule infractions and violations of standards as grounds for immediate termination of employment. These include but are not limited to:  theft in any form, insubordinate behavior, vandalism or destruction of Company property, being on Company property for non-business-related purpose during non-business hours, the use of Company equipment and/or Company vehicles without prior authorization by management, untruthfulness about personal work history, skills, or training, divulging Company business practices, and misrepresentations of the Company to a customer, a prospective customer, the general public, or an employee.

{¶ 12} 7. At some point, relator began submitting time sheets indicating that he worked from 8:00 a.m. to 4:00 p.m.

{¶ 13} 8. Hammond became suspicious of relator's reported time and hired a private investigator to follow him.  According to the private investigator's logs, relator was observed on numerous occasions during the summer of 2015.  Despite the fact that relator submitted time sheets indicating that he was working at the Red Cross between the hours of 8:00 a.m. and 4:00 p.m., relator was observed mowing his own yard, visiting the grocery store, visiting his wife at work, and visiting family members in West Virginia.

{¶ 14} 9.  Relator acknowledges that he was not at the Red Cross on the days noted by the investigator.  Relator explains his behavior by stating that Mark Morrow, his supervisor at the Red Cross, instructed him that such action was acceptable.

{¶ 15} 10. In a letter dated August 31, 2015, relator was notified that his employment was being terminated based on significant violations of the employee handbook, standards of conduct, as well as the Modified Duty Off-Site program agreement and time reports.  Specifically, the letter provides:

Please allow this letter to serve as notice of the termination of your employment with Hammond Construction, Inc., effective the date of this letter. Your termination is based on significant violations of the Employee Handbook; Standards of Conduct; as well as the Modified Duty Off-Site Program Agreement and Time Reports. These violations include but are not limited to dishonesty, alteration, falsification, and misrepresentation of time records, and attendance.

> Your termination from employment also includes the immediate termination of any salary continuation and your assignment to modified duty off-site at the Red Cross or any other facility. In addition to your immediate termination of employment, Hammond Construction, Inc., reserves all legal recourse to pursue you for damages resulting from your actions.

{¶ 16} 11. After his termination, relator filed a motion requesting TTD compensation.

{¶ 17} 12. Relator's request for TTD compensation was heard before a district hearing officer ("DHO") on January 5, 2016.  The DHO denied relator's request for TTD compensation finding that he had voluntarily abandoned his employment when he falsified his time sheets.  Specifically, the DHO order provides:

> The District Hearing Officer finds that the Injured Worker violated a written work rule that the Injured Worker knew or should have known the violation of which could result in his termination. Specifically, the Injured Worker was on written notice (pursuant to the Employer's handbook, as well as every time sheet the Injured Worker signed) that the submission of inaccurate time sheets could result in the Injured Worker's termination. Despite this fact, the Injured Worker did submit numerous time sheets to the Employer of record that the Injured Worker does not dispute were inaccurate.
>
> This order is based on the Ohio Supreme Court's [*State ex rel. Louisiana-Pacific Corp. v. Indus. Comm.*, 72 Ohio St.3d 401 (1995)] case, the 08/31/2015 termination letter from the Employer to the Injured Worker, the Injured Worker's numerous signed time sheets on file, the Employer's handbook filed 11/12/2015 (especially sections 3 and 5), the 02/02/2015 United States Postal Service item delivered receipt, the 06/24/2015, 07/10/2015, 07/29/2015, 08/03/2015 and 09/02/2015 Investigation Reports, the 11/09/2015 Staff Hearing Officer hearing transcript, the 01/30/2015 light duty job offer correspondence from the Employer to the Injured Worker (stating that the Employer's policies would continue to be binding on the Injured Worker during the Injured Worker's light duty employment), the testimony at hearing of Mr. Bissemeyer regarding the numerous instances where the Injured Worker's observed activities on many days conflicted with the time sheets the

> Injured Worker submitted to the Employer coinciding with those dates, and the testimony at hearing of Mr. Kirkpatrick that the Injured Worker was provided a copy of the Employer's handbook as part of the Injured Worker's light duty job offer, that the Injured Worker signed and returned the light duty job offer and that the Injured Worker was paid 40 hours a week for his light duty work at Red Cross based upon the time sheets the Injured Worker submitted to the Employer. The District Hearing Officer also notes that there was no Mr. Morrow at hearing to testify or answer questions (or evidence from Mr. Morrow submitted at hearing) to corroborate the Injured Worker's statement that Mr. Morrow with the Red Cross authorized the Injured Worker completing the time sheets as he did.

{¶ 18} 13. Relator appealed and the matter was heard before a staff hearing officer ("SHO") on March 2, 2016. At this hearing, Hammond presented the affidavit of Mark Morrow, the volunteer at the American Red Cross, who signed relator's time sheets, and who relator argued counseled him on the manner in which to complete those time sheets. Specifically, Mr. Morrow's affidavit provides:

> [Ten] I did not track or verify Mr. DiPietrantonio's time on a daily basis. Based on my awareness that he was only to be present at the Red Cross on Monday through Friday from 9:00 A.M. to 12:00 P.M., I cannot state with any certainty what days he actually worked and whether or not he actually worked the entire three hours from 9:00 A.M. to noon on any specific date.

> [Eleven] I did sign Mr. DiPietrantonio's timesheets on a weekly basis. However, I always signed those time sheets in blank at the beginning of each week before the work was performed. At the time I signed the timesheet, the timesheets were blank and did not have information or any dates and times worked completed [sic]. At no time did I instruct Mr. DiPietrantonio to complete his timesheets in an inaccurate or false manner.

> [Twelve] I relied on Mr. DiPietrantonio to completely, honestly, and accurately fill out the dates and times worked and submit the time reports to his employer.

> [Thirteen] I have never seen the completed timesheets which are attached to this Affidavit until after Mr. DiPietrantonio's assignment at the Red Cross was ended (after August 2015).

[Fourteen] Based on the timesheets submitted, it appears that Mr. DiPietrantonio was submitting time sheets generally representing 40 hours of work at the Red Cross each week. This representation is not accurate given my understanding that he was to work at the Red Cross generally three hours per day (unless absent for a doctor's appointment or other issue).

[Fifteen] The time reflected on Mr. DiPietrantonio's time sheets does not appear accurate.

[Sixteen] Beginning in April of 2015, Mr. DiPietrantonio's timesheets reflect his representation that he generally worked from 8:00 A.M. to 4:00 P.M. each day at the Red Cross. Again, this is not consistent with my understanding that he was generally working only three hours per day (9:00 A.M. to noon, Monday—Friday) when available.

[Seventeen] My reasoning for signing the blank timesheets at the beginning of each week was that I trusted Mr. DiPietrantonio to submit an accurate, complete, and truthful timesheet.

[Eighteen] I am now aware that timesheets that have been submitted in many respects are not an accurate and truthful representation of the time he actually worked with the Red Cross in Wintersville, OH.

{¶ 19} The SHO affirmed the prior DHO order, and denied relator's request for TTD compensation. Specifically, the SHO concluded that relator voluntarily abandoned his employment with Hammond when he was terminated, stating:

The District Hearing Officer found that the Injured Worker had violated a written work rule of which he was aware and that violation led directly to his termination from employment. Specifically, the District Hearing Officer found that the Injured Worker submitted numerous time sheets to his Employer from June through August, 2015 that did not contain an accurate representation of his hours of work for the American Red Cross. The Injured Worker had accepted a modified duty off-site (MDOS) work assignment at the Red Cross. The Injured Worker had accepted a modified duty off-site (MDOS) work assignment at the Red Cross, offered by his Employer, as he could not return to work at his former position of employment due to work restrictions from his treating physician. The District Hearing Officer found that

the investigation report submitted by Mr. Bissemeyer for Infoquest indicates that the Injured Worker did not work the hours he listed on his time sheets on numerous occasions and this was a violation of the Employer's written work rules.

In affirming the findings and order of the District Hearing Officer, the Staff Hearing Officer relies upon the Infoquest investigation reports that describe numerous dates in June, July, and August 2015 where the Injured Worker did not work for the Red Cross on the dates and times indicated on his time sheets; the time sheets signed by the Injured Worker in June, July, and August 2015 that indicate that he worked eight hours per day for the Red Cross and that contain a statement below his signature warning him that "falsification or misrepresentation of these hours will result in removal from the MDOS program and disciplinary action up to and including termination;" the Employee Handbook that was sent to the Injured Worker by the Employer of Record that indicates in item 3.3 that "employees are required to accurately record all time worked" and also indicates in item 5.1 that "altering or falsifying your time record, that of another employee or allowing your time record to be altered or falsified" is punishable by discipline up to and including termination of employment. The Staff Hearing Officer also relies upon the Injured Worker's testimony wherein he admitted that he falsely completed his time sheets regarding the dates and times of work for the Red Cross. Although the Injured Worker claims his supervisor at the Red Cross, Mark Morrow, permitted or even encouraged him to record false times, that testimony is directly opposed by Mr. Morrow's 01/07/2016 affidavit. Nonetheless, it is clear that the Injured Worker was ultimately responsible for signing and submitting inaccurate time sheets to the Employer in violation of the Employer's express policy.

Based on this evidence, the Staff Hearing Officer concludes that the Employer has met its burden of proving that the Injured Worker was terminated from employment for violation of a written work rule of which he was aware, which is sufficient to bar the requested period of temporary total disability.

{¶ 20} 14. Relator's further appeal was refused by order of the commission mailed March 23, 2016.

{¶ 21} 15. Thereafter, relator filed the instant mandamus action in this court.

Conclusions of Law:

{¶ 22} For the reasons that follow, it is this magistrate's decision that this court should deny relator's request for a writ of mandamus.

{¶ 23} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ 24} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 25} TTD compensation awarded pursuant to R.C. 4123.56 has been defined as compensation for wages lost where a claimant's injury prevents a return to the former position of employment. Upon that predicate, TTD compensation shall be paid to a claimant until one of four things occurs: (1) claimant has returned to work; (2) claimant's treating physician has made a written statement that claimant is able to return to the former position of employment; (3) when work within the physical capabilities of claimant is made available by the employer or another employer; or (4) claimant has reached maximum medical improvement ("MMI"). *See* R.C. 4123.56(A); *State ex rel. Ramirez v. Indus. Comm.*, 69 Ohio St.2d 630 (1982).

{¶ 26} The principles behind the voluntary abandonment doctrine and the adherence to the requirements of *State ex rel. Louisiana-Pacific Corp. v. Indus.*

*Comm.*, 72 Ohio St.3d 401 (1995), are obvious. The Supreme Court of Ohio recognized the possibility that some employers would summarily terminate injured workers in an effort to avoid the possibility of having to pay TTD compensation. In order to prevent this abuse of the system, the Supreme Court held in *Louisiana-Pacific* that there must be a written work rule or policy that (1) clearly defines the prohibited conduct, (2) has been previously identified by the employer as a dischargeable offense, and (3) is known or should be known to the employee. By following this test, an employer can establish that an injured worker has lost wages not due to the allowed conditions in a workers' compensation claim, but due to their own voluntary acts and the potential for abuse is significantly minimized if not eliminated altogether.

{¶ 27} Following his injury, relator was not able to return to his former position of employment. However, Hammond was able to offer him modified work duties which were within his restrictions. Because relator was working this modified job, the principals of *Louisiana-Pacific* and the voluntary abandonment doctrine apply. Hammond demonstrated that there was a written work rule contained in its employee handbook which clearly identified the prohibited conduct and was identified as a dischargeable offense, which relator knew or should have known. Further, Hammond presented the MDOS agreement signed by relator acknowledging that he understood that, while working in the modified job at the Red Cross, all the rules contained in the employee handbook still applied.

{¶ 28} At the hearing before the SHO, relator acknowledged that he falsified his time records. Relator's only explanation was that Morrow instructed him how to fill out these time forms and essentially acquiesced in his deception. Morrow submitted an affidavit indicating that he did not tell relator to falsify his time sheets and acknowledging that he was guilty of signing blank time sheets, and allowing relator to fill in the hours he worked. Morrow acknowledged that this was not a good idea. The commission did not find relator's testimony to be credible and found that Hammond met its burden of proving that relator was discharged for violating a written work rule.

{¶ 29} Based on the foregoing, it is this magistrate's decision that relator has not demonstrated that the commission abused its discretion when it denied his application for TTD compensation based on a finding that he had voluntarily abandoned his

employment with Hammond, and this court should deny his request for a writ of mandamus.

/S/ MAGISTRATE
STEPHANIE BISCA

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).